IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| RICKY DUANE CLEMONS,<br><br>     Plaintiff,<br><br>vs.<br><br>CAROLYN W. COLVIN, Commissioner<br>of the Social Security<br>Administration,<br><br>     Defendant. | **No. 3:14-cv-00063-JEG-RAW**<br><br>**REPORT AND RECOMMENDATION<br>AND ORDER** |

Plaintiff Ricky Duane Clemons seeks review of the Social Security Commissioner's decision denying his application for supplemental security income under Title XVI of the Social Security Act (the Act), 42 U.S.C. §§ 1381-1383f. This Court reviews the Commissioner's final decision pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3). The case has been referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b).

## I.   PROCEDURAL AND FACTUAL BACKGROUND

Mr. Clemons filed his application for benefits on January 20, 2011, alleging a disability onset date of January 1, 2009.[1] (Tr. at 167-172). His application was denied initially and upon review. Mr. Clemons requested and was granted an

---

[1] Mr. Clemons originally filed an application for SSI benefits on February 2, 2009. (Tr. at 163-169). Mr. Clemons failed to attend examinations set up by the state agency. (*Id.* at 75-76). His claim was denied based on medical records reviewed. (*Id.* at 75). The 2009 application is not before the Court but the records are included in the current transcript [6], hereinafter referred to as "Tr."

administrative hearing, which Administrative Law Judge John M. Wood (ALJ) conducted by video conference on January 3, 2013. Mr. Clemons was represented at the hearing by attorney Michael DePree. Testifying at the hearing were Mr. Clemons and vocational expert (VE) George Paprocki. (Tr. at 39-50, 50-63, 138). At the time of hearing counsel orally amended the onset date to January 20, 2011. (*Id.* at 37). Judge Wood issued a decision on February 8, 2013, denying Mr. Clemons' claim. (*Id.* at 17-26).

On March 1, 2013 Mr. Clemons asked the Appeals Council to review Judge Wood's decision. (Tr. at 13). In an April 14, 2014 Notice of Appeals Council Action, the Appeals Council denied Mr. Clemons' review request. (*Id.* at 1-4). Mr. Clemons' Complaint [1] was filed May 15, 2014, pursuant to 42 U.S.C. § 405(g).

Mr. Clemons was born September 8, 1958, and was 52 years old when he filed his application. (Tr. at 25). He has a GED and past relevant work in construction. (*Id.* at 40-41). Clemons alleges a disability due to hepatitis C, inflammatory arthritis, organic brain disorder and history of alcohol abuse. (*Id.* at 19).

A.   **Medical Records**

Mr. Clemons was diagnosed with hepatitis C in 2008 during a hospitalization for treatment of pneumonia. (Tr. at 644). Mr. Clemons also has a significant past history of drug and alcohol abuse but in 2010 completed a residential treatment program. (*Id.* at 1179-1188).

Mr. Clemons established a care relationship with Community Health Care, Inc. (CHI), in 2010 while he was in alcohol rehabilitation. (Tr. at 1194). On November 23, 2010 he presented at the clinic complaining of pain in his right wrist and right foot. (*Id.* at 1194). A nurse practitioner, Jean Styvaert, noted Mr. Clemons' history of hepatitis C with associated fatty liver as well as abnormal rheumatoid factor, positive ANA and positive testing for Sjögren antibody factor in his medical records, arranged for follow-up blood work, and prescribed a pain medication, Tramadol. (*Id.*) She noted Mr. Clemons needed to apply for an Iowa Care (state medical insurance) card to facilitate a referral to University of Iowa Hospitals and Clinics (UIHC) for rheumatology consult. (*Id.*)

Mr. Clemons was seen a week later, on November 30, 2010, for a lab follow-up and again saw Ms. Styvaert. (Tr. at 1193). She noted he had been diagnosed with an abnormal rheumatoid factor, had been referred to Iowa City (presumably UIHC) but "never made

3

it out to Iowa City." Mr. Clemons was told to "get downtown" to apply for an Iowa Care card so that a rheumatology referral could be made. (*Id.*)

Mr. Clemons returned to CHI on December 13, 2010 for a refill of his pain medication, complaining of swelling in his left wrist. (Tr. at 1191). Ms. Styvaert noted Mr. Clemons held his left wrist rigidly, there was no obvious swelling or deformity but pain with palpation and limited range of motion. She diagnosed polyarthralgia (pain in joints simultaneously), noted his history of elevated liver function tests and that Mr. Clemons needed to reapply for Iowa Care coverage so he could be referred to UIHC. (*Id.*) She started Mr. Clemons on Celebrex and refilled the Tramadol prescription. (*Id.*)

Mr. Clemons next visited CHI on January 3, 2011, complaining of pain in both feet and hands which was not helped by pain medications. (Tr. at 1190). On examination, Ms. Styvaert found no obvious deformity in either hand although there was a faint rash on them. (*Id.*) She discontinued the Celebrex and Tramadol prescriptions and prescribed Salsalate for pain (and Ranitidine to protect his stomach), and ordered further lab work so referrals could be made. (*Id.*) Ms. Styvaert's notes indicate that during a January 11, 2011 phone check with Mr. Clemons, she had changed the prescription of Ranitidine to Omeprazole, and after talking to Mr.

4

Clemons again on January 14, 2011, changed the prescription of Salsalate to Hydrocodone. She noted referrals had been sent to UIHC for rheumatology and hepatology. (*Id.* at 1189).

On February 4, 2011 Mr. Clemons was seen by Dr. Syed Haque at CHI complaining of continued hand and feet pain and requesting prescription refills. (Tr. at 1236). On general examination, Dr. Haque did not find evidence of any deformity of the joints of his hands or wrist. Mr. Clemons had no leg swelling. Mr. Clemons' prescriptions were refilled. Dr. Haque noted Mr. Clemons had acquired an Iowa Care card and had a pending appointment at UIHC which had not been set up yet. (*Id.*)

On February 10, 2011 Mr. Clemons went to CHI complaining of swelling in his left hand. (Tr. at 1235). Ms. Styvaert noted rheumatology and hepatology consultations were still pending, found the left hand to be edematous (enlarged), warm and tender to touch on examination. (*Id.*) He was sent to a UIHC Emergency Treatment Center that day for further evaluation. (*Id.*) At UIHC Mr. Clemons reported to medical staff that he had been diagnosed with rheumatoid arthritis in the 1990s and had been having "flares" off and on since then. (*Id.* at 1208). Mr. Clemons told medical staff he was having flares 1-2 times a month, usually if he stopped taking his medications. (*Id.*) He also reported his hepatitis C history, which prevented him from taking methotrexate for his

5

arthritis. (*Id.*) On physical examination, staff found a tender swollen right[2] hand and fingers with diffuse erythema (redness) and hyperemia (increased blood flow to the tissues) though no induration (hardening) or fluctuance (skin infection) with 5/5 strength in grips and ankles. (*Id.* at 1209). X-rays of Mr. Clemons' left hand showed mild soft tissue prominence of the PIP joints of the second through fifth digits, diffuse soft tissue swelling about the hand, no significant osteophyte formation, a small erosion at the ulnar aspect of the head of the third metacarpal but no fracture or dislocation. (*Id.* at 1210). Dr. Gregory Bell diagnosed polyarticular right hand pain ("consider immune arthritis"), prescribed Prednisone and Vicodin for the pain. A follow-up visit to UIHC rheumatology was scheduled. (*Id.* at 1212).

On March 8, 2011 Mr. Clemons underwent a consultative physical examination with Dr. Stanley Rabinowitz. (Tr. at 1214-1219). Dr. Rabinowitz had access to medical records from April and December 2010[3] and January 2011. (*Id.* at 1214). He took a history from Mr. Clemons and conducted a physical examination. (*Id.* at

---

[2] The Court believes this is a mistake in the medical record since all other notes and the x-rays taken reference plaintiff's left hand.

[3] His reference to report dated 12-13-11 is likely a typographical error as Dr. Rabinowitz's examination took place in March 2011.

1214-1216). Mr. Clemons complained of pain in his feet, ankles, wrists and hands with intermittent swelling and stiffness. (*Id.* at 1214). He said he could perform simple hand functions unless his arthritis was flaring up. (*Id.*) Mr. Clemons reported he could stand, sit and walk for limited periods of time. (*Id.*) He was driven to the examination.[4] At the time of the exam Mr. Clemons said he was going to classes. (*Id.*) He discussed his past drug and alcohol abuse with Dr. Rabinowitz. (*Id.* at 1214-1215). Mr. Clemons said he had pain in his right upper quadrant and fatigue. (*Id.* at 1215).

On physical examination[5] Dr. Rabinowitz observed Mr. Clemons walked normally without assistance. His liver and spleen were not enlarged and Dr. Rabinowitz did not note any ascites or masses. (Tr. at 1216). During range of motion testing, Dr. Rabinowitz did not find active joint inflammation or deformity, instability, contracture or paravetebral muscle spasm. (*Id.*) Straight leg raising was negative at 90 degrees in both sitting and supine positions. (*Id.*) Grip strength in Mr. Clemons' right hand was 70% of normal with mild impairment of digital dexterity;

---

[4] Other records indicate Mr. Clemons lost his drivers license as the result of a DUI arrest. (Tr. at 1141).

[5] The Court here notes only the examination results relevant to the medical conditions at issue in the case.

left hand grip strength and digital dexterity was not impaired. (*Id.*) Mr. Clemons could oppose his right thumb to all but his fifth finger of his right hand but could oppose his left thumb to all fingers of his left hand. (*Id.*) Dr. Rabinowitz observed mild PIP joint enlargement and mild synovial hypertrophy in Mr. Clemons' wrists. (*Id.*) Mr. Clemons was right hand dominant with 4/5 grip strength in his right hand and 5/5 in his left hand. (*Id.*) He did not have difficulty getting on and off the examination table and could squat. (*Id.*) Motor strength testing of upper and lower extremities was 5/5 with no evidence of atrophy. (*Id.*) Mr. Clemons' memory was intact and he was fully oriented during the examination. (*Id.*) Dr. Rabinowitz reported Mr. Clemons was able to relate during the examination and would appear to be able to handle his own funds. (*Id.*) Dr. Rabinowitz did not give an opinion about Mr. Clemons' functionality. His two relevant "impressions" were not definitive: "History of inflammatory arthropathy, ? secondary to rheumatoid arthritis . . . [c]hronic hepatitis C infection, ? activity and severity with associated fatigue." (*Id.* at 1217).

On March 16, 2011 Mr. Clemons presented to CHI wanting refills on the Prednisone and Vicodin prescriptions given by UIHC on February 10, 2011. (Tr. at 1234). He complained of right ankle pain and still had not been seen by UIHC rheumatology or hepatology. (*Id.*) Mr. Clemons reported it seemed like he had fewer

8

flares but the Prednisone was making him jittery and nauseous. (*Id.*) Ms. Styvaert noted Mr. Clemons appeared to be in obvious discomfort, was walking with a cane and had an antalgic gait (a limp to avoid pain). She decreased his Prednisone dosage, put him on Omeprazole for his stomach and added a prescription of Hydrocodone as needed for pain. (*Id.*)

On March 20, 2011 a medical consultant, Dr. Dennis Weis, M.D., completed a checklist Physical Residual Functional Assessment form based on a medical records review. (Tr. at 1220-27). Dr. Weis did not examine or treat Mr. Clemons. Dr. Weis opined Mr. Clemons could stand and/or walk six hours in an eight-hour day and could sit for the same period. He wrote that Mr. Clemons had manipulative limitations in "handling" and "fingering," adding "Limit Rt to frequently. Lt is unlimited." (*Id.* at 1223). In his comments Dr. Weis noted that treating examining sources "do not make specific recommendations regarding residual functional capacity" and he thought Mr. Clemons' credibility was "eroded" to a degree by discrepancies and a lack of documentation in the medical records. (*Id.* at 1227).

Mr. Clemons reported to CHI on March 31, 2011 to discuss medications. (Tr. at 1233). He said he was scheduled for an appointment at UIHC in April 2011. (*Id.*) Ms. Styvaert refilled his prescriptions, modified his Prednisone dosage and noted they would

9

make sure Mr. Clemons had transportation to his UIHC appointment. (*Id.*)

On April 13, 2011 Mr. Clemons reported to CHI, complaining both his hands were hurting and seeking more Hydrocodone. (Tr. at 1232). Ms. Styvaert reviewed his history, prescribed sufficient Hydrocodone to get Mr. Clemons through his appointment at UIHC (scheduled for April 27), copied records to send to UIHC and had staff arrange for Mr. Clemons' transportation to his appointment. (*Id.*)

Mr. Clemons again visited CHI on April 26, 2011, the day before his UIHC appointment. He requested more pain medication and reported that his appointment had been changed to May 17, 2011 because of transportation issues. (Tr. at 1231). Mr. Clemons reported he sometimes had to take the Hydrocodone with Tylenol three times a day and sometimes only once a day. (*Id.*) He said his knees were swelling but his feet were not as bad. (*Id.*) Ms. Styvaert refilled his Hydrocodone prescription to get him through to his May 17 appointment. He could discontinue Omeprazole and no longer took Prednisone. (*Id.*)

On May 24, 2011 Mr. Clemons was seen at CHI by physician's assistant Emily Mally. He complained of bilateral foot pain, more severe on the left than right and came in a wheelchair as he could not walk. (Tr. at 1266). Mr. Clemons said he missed

his May 17 appointment at UIHC because he mixed up the days. In her clinic notes Ms. Mally wrote this was the second or third time Mr. Clemons had missed his appointment. (*Id.*) She discussed with him taking personal responsibility for making his appointments and told Mr. Clemons the clinic did not manage chronic pain when he needed to see a specialist. (*Id.*) She told him she would not prescribe any narcotics for him that day. "He asked if he could just have a few to get him through the day and I said no." (*Id.*) Ms. Mally prescribed tapered doses of Prednisone and prescribed some Nabumetone (a NSAID), advising him to reschedule his UIHC appointment. (*Id.*)

On June 20, 2011 Mr. Clemons was seen at the Genesis Medical Center (GMC) Emergency Department complaining of right upper quadrant abdominal pain radiating to his back for four hours after dinner. (Tr. at 1284). Abdominal x-rays were taken and labs drawn. (*Id.* at 1286-87). A diagnosis of constipation was reached and medication to relieve the condition given. (*Id.* at 1287).

Mr. Clemons was seen at UIHC to evaluate his hepatitis C on June 29, 2011. (Tr. at 1257-1260). Physician's assistant Stephanie Dee reviewed Mr. Clemons' medical records, took a full history and conducted a physical examination. (*Id.*) Mr. Clemons described having right sided abdominal pain over the last couple of years, occurring a couple of times a day mostly with positional

changes, unaffected by eating. He said he had had joint pain and swelling in his hands and feet for the past two years. (*Id.* at 1257). At that time Mr. Clemons had been sober for the last eight months. (*Id.* at 1258). On physical exam, Mr. Clemons did not have ascites in his abdomen and had obvious bilateral swelling in his hands. (*Id.*) Ms. Dee discussed prognosis and risk of transmission for hepatitis C with Mr. Clemons, ordered lab work to check genotype and to evaluate for other forms of chronic liver disease as his enzymes were elevated. (*Id.* at 1259). She recommended he be vaccinated for hepatitis A and B through his primary provider and that he be rescheduled for follow up to discuss lab results, recommendations and treatment options. (*Id.*) A rheumatology consult was also requested. (*Id.* at 1258).

On August 24, 2011 Mr. Clemons saw Ms. Styvaert again at CHI. (Tr. at 1265). He said his feet were hurting. Ms. Styvaert noted both feet were slightly "erythematous and warm to touch," but there was no swelling. She felt he had had a probable rheumatoid arthritis flare up and prescribed Medrol Dosepak with directions to not take the Nabumetone he had been taking while on the new drug. (*Id.*) Ms. Styvaert noted Mr. Clemons had been referred multiple times to rheumatology at UIHC and "finally" had an appointment for October 17. (*Id.*)

Mr. Clemons returned to the GMC Emergency Department again on August 31, 2011 requesting a refill on medications. (Tr. at 1278). On physical examination the ER physician noted diffuse anterior ankle and plantar foot tenderness but normal range of motion and no swelling. (*Id.* at 1279). Mr. Clemons' prescriptions for Nabumetone and Lortab (Hydrocodone) were refilled and he was directed to follow up with his primary care physician at CHI. (*Id.*)

On September 9, 2011 Mr. Clemons returned to the UIHC hepatitis clinic to follow up on his hepatitis C condition and was again seen by physician's assistant Dee. (Tr. at 1252-1256). Lab results indicated his hepatitis C was genotype 3. (*Id.* at 1252). He reported his August visit to the ER for what he told Ms. Dee was severe pain and swelling. (*Id.*) He had started vaccinations for hepatitis A and B. (*Id.*) He had joint pain and swelling in his feet, greater on the right than left. (*Id.* at 1254). Based on his lab results, Ms. Dee discussed treatment of hepatitis C with peginterferon and ribavirin, a 24-week treatment the side effects of which would include fatigue and possible increased pain. (*Id.*) Mr. Clemons needed to apply for medication assistance for this treatment through the Iowa Care program; the treatment would not be scheduled until after his rheumatology appointment. (*Id.*)

On September 16, 2011 Dr. Weis's medical record assessment was reviewed by another agency consultant, Dr. Laura

13

Griffith, D.O. She "affirmed" Dr. Weis's March 20, 2011 assessment noting Mr. Clemons "continue[d] to seek medication for his pain" and had "not followed through" with his referral to a rheumatologist. (Tr. at 1239).

On January 14, 2012 Mr. Clemons went to the Mercy Medical Center-Clinton Emergency Department complaining of right foot pain for an arthritis flare up. (Tr. at 1324-1341). Dr. Thomas Leavenworth examined him and observed Mr. Clemons' foot appeared normal without tenderness. (*Id.* at 1337). Mr. Clemons was given prescriptions for Prednisone, Lortab and Diclofenac Sodium. (*Id.*) Mr. Clemons was seen at the UIHC rheumatology division on February 3, 2012. (Tr. at 1246-1251). X-rays were taken, labs drawn and physical and history performed. (*Id.*) Mr. Clemons told the examining physician the pains in his hands started in the 1990's, after which he experienced more and more pain in his feet. (*Id.* at 1246). He described that when the pain in his hands worsened, his joints would get red, warm and swollen and it would take a couple of days before his hands would return to normal. (*Id.*) Mr. Clemons reported that over the last couple of months he had the hand flares about twice a month. He described a burning pain requiring up to 6-10 tablets of ibuprofen a day and occasionally Prednisone. (*Id.*) He said he was more fatigued and felt some leg weakness. Most of his pain was in both hands and feet, but it would appear in his

14

left hip and knee, left ankle, right ankle and also his neck. (*Id.*)
He rated his pain that day at a 5 on a scale of 0-10. (*Id.*) He
would have about two hours of stiffness in the morning. (*Id.*)

On physical examination, Mr. Clemons did not appear to
be in acute distress. (Tr. at 1246). The physician observed a
purpuric (reddish-purple) rash about both feet. (*Id.*)  Mr. Clemons
had a normal gait although on a wide basis. He could walk on
tiptoes and on heels with some difficulty. (*Id.*) Mr. Clemons could
squat and had no active joint inflammation. (*Id.*) He did have
significant pain in the first CMC and MCP joints bilaterally. (*Id.*)
Mr. Clemons had 5 degrees of flexion contracture and some
tenderness in both elbows but no effusion. (*Id.*) X-rays of Mr.
Clemons' feet showed chronic healing transverse fractures through
the neck of the right fourth and third metatarsal, no evidence of
significant erosions and a small osteophyte formation in the
midfoot in both feet. (*Id.* at 1249). X-rays of Mr. Clemons' hands
showed small erosive/cystic changes at the base of the right fifth
metacarpal and the right ulnar styloid process were corticated, an
indication of chronic process but no erosions or evidence of acute
fracture or dislocation. (*Id.*)

Based on Mr. Clemons' lab results, the examining
physician wrote that Mr. Clemons' "clinical presentation is more
in favor of an arthritis secondary to Hepatitis C infection" and

that his work in construction may also have contributed to the arthritis in his hand and may have resulted in some degenerative arthritis in both hands. (Tr. at 1246-1247). The doctor agreed with the plan to treat Mr. Clemons' hepatitis C with interferon/ribavirin as it might help his arthritis. Prednisone was prescribed and Mr. Clemons was told to take calcium+Vitamin D to prevent bone loss. (*Id.* at 1247).

Mr. Clemons was seen at a UIHC Primary Care Center on March 12, 2012 and May 2, 2012 for health issues which did not involve complaints of pain or swelling in his hands of feet. On both occasions he reported he was contemplating the interferon/ribavirin treatment. (Tr. at 1296, 1298).

Mr. Clemons returned again to the UIHC hepatitis clinic on July 24, 2012. He again saw Ms. Dee. (Tr. at 1288-91). Mr. Clemons reported that he had run out of Prednisone and had better control of joint pain and swelling when on it, though he still had flare ups a couple of times a month. He had had chronic mild pain since running out of the Prednisone. Swelling was "not an issue" when he saw Ms. Dee on July 24. Ms. Dee wrote that now Mr. Clemons was off Prednisone his hepatitis C treatment could begin during which he "should not take Prednisone." (*Id.* at 1291).

On July 31, 2012 Mr. Clemons went to the GMC Emergency Department reporting chronic pain to his right wrist and left elbow

16

after completing a course of treatment with Prednisone. (Tr. at 1274). He reported feeling moderate pain which was exacerbated by movement. (*Id.*) He told the physician's assistant that "doctor thinks [the joint pain] may be related to hepatitis" and that he was awaiting a call to begin treatment. (*Id.*) On physical examination Mr. Clemons had normal range of motion and strength, but his right dorsal wrist and left elbow were mildly swollen, tender and warm. (*Id.* at 1275). He was given prescriptions for Nabumetone and Tramadol. (*Id.*) Mr. Clemons was to follow up with his primary care doctor within one to two weeks. (*Id.* at 1276).

On December 18, 2012 Mr. Clemons returned to the UIHC hepatitis clinic. (Tr. at 1321-1323). He was completing week four of the interferon/ribavirin treatment. (*Id.*) He complained of ongoing fatigue and joint pains. (*Id.* at 1321). The physician who saw him, Dr. Jeffrey Dunkelberg, observed Mr. Clemons appeared fatigued but there was no edema in his extremities. (*Id.* at 1322). Dr. Dunkelberg wrote Mr. Clemons was tolerating treatment well and they were checking his CBC labs weekly, and that Mr. Clemons had "[i]nflammatory arthritis and cryoglobulinemia [abnormal blood proteins] associated with chronic hepatitis C." (*Id.* at 1322).

The record transcript contains two post-hearing instances of Mr. Clemons' interaction with medical providers which the Court must assume the ALJ had in hand before his February 8,

2013 decision. On January 15, 2013 Mr. Clemons was seen at the UIHC hepatitis clinic for treatment follow-up. (Tr. at 1345-1348). He had completed eight weeks of hepatitis C treatment. He said he had been to a local emergency room twice due to worsening joint pain (there is no record of these in the transcript), and said the pain involved his back, neck, and legs and had gotten worse since beginning hepatitis treatment. (*Id.* at 1345). His current medications included Hydrocodone-Acetaminophen, Hydroxyzine, ibuprofen, peginterferon, and ribavirin. (*Id.* at 1346). No edema was noted on physical examination. (*Id.*)

On February 7, 2013 Mr. Clemons went to the GMC emergency department complaining of "multiple musculoskeletal pains – swelling; IN PAIN." (Tr. at 1349). He was prescribed Hydrocodone-Acetaminophen. (*Id.* at 1351).

B.  **Hearing Testimony**

At the January 3, 2013 hearing Mr. Clemons testified that for the past six months he had been living with his cousin, after living at a homeless shelter. (Tr. at 39-40). He did not have a drivers license and used busses or rides with friends to get around. (*Id.* at 40). He had a GED. (*Id.*) He had a work history in the construction field. (*Id.* at 40-41).

Mr. Clemons testified he could not return to work in the construction field because his hands and feet flared up a couple

18

of times a month, to the point he could not walk and could not use his hands. The flare ups were painful and lasted a couple of days. (Tr. at 41). At the time of hearing Mr. Clemons was not taking pain medications for his arthritis because he was going through interferon/ribavirin treatment for his hepatitis C. (*Id.* at 42). He testified when he was taking Prednisone the flare ups were not as bad, "not as debilitating," although they still occurred. (*Id.*) Mr. Clemons told the ALJ the interferon/ribavirin treatment was to last six months to a year and the side effects did not help much. (*Id.* at 43). He agreed that before he started the treatment for hepatitis C medications he had been taking helped "a little bit" with his flare ups. (*Id.*) Mr. Clemons had not used alcohol since November 2010 except on one occasion during a flare up. (*Id.* at 43-44).

With respect to records [33F-9] (Tr. at 1253) which indicated Mr. Clemons had been attending classes for training for heating and air conditioning in September 2011, he testified he was unable to keep up with the classes because he missed so much school with the flare ups. He quit after three months. (*Id.* at 44-45). Mr. Clemons agreed that when he was not having flare ups he could function. (*Id.* at 45). He also testified he could do basic activities if he did not overdo. (*Id.* at 46). A flare up sometimes occurred if he "push[ed] it real hard." (*Id.*)

19

On examination by his attorney, Mr. Clemons testified he was not on the hepatitis C treatment at the time he was missing school but was on Prednisone. (Tr. at 46-47). He estimated he could probably stand still 20 minutes or so, probably a couple of hours a day when he was not having a flare up. (*Id.* at 47). He testified that even when taking Prednisone, during a flare up he could not stand on his feet or use his hands. (*Id.*) He had tried working at a work site for disabled individuals (assembling light sockets) but could not stand on his feet eight hours. (*Id.* at 48-49). During the three to four weeks he worked at the site, he estimated he was out three to four days due to flare ups. (*Id.* at 50).

The vocational expert, Mr. Paprocki, testified Mr. Clemons would not be able to do his past work. (Tr. at 52-53). In response to a hypothetical limiting a claimant with Mr. Clemons' past work history to light work with no climbing of ladders, ropes or scaffolds, other possible functions could be performed occasionally, manipulative functions frequently, environmental hazards avoided such as unprotected heights and dangerous machinery, and work would need to be limited to simple or repetitive tasks involving little or no change in work routine, occasional interaction with the public, co-workers and supervisors, Mr. Paprocki testified there would be unskilled light work available in Iowa, such a photocopy machine operator, office

20

helper, and a wide variety of other unspecified positions. (*Id.* at 53-54). With the additional limitation that an individual would need to alternate sitting and standing periodically throughout the day, each about half the time, Mr. Paprocki believed the prior light work jobs he referenced in answer to the first hypothetical would be precluded but that there were other jobs available, such as parking lot cashier, small parts assembler or toy assembler, jobs he said were representative of a larger number of jobs available in Iowa. (*Id.* at 54-55). He testified an employer would tolerate no more than one absence a month from an employee in these types of jobs. (*Id.* at 55).

On examination by Mr. Clemons' attorney, Mr. Paprocki testified the light work jobs discussed would require bimanual dexterity at a frequent level and would not be feasible if an individual had only occasional dexterity in both hands. (Tr. at 55). The ALJ then amended the hypothetical to add bilateral manipulative functioning being occasional, to which Mr. Paprocki responded the job of parking lot cashier could still be available, although with the limitation of occasional contact with customers that job would be precluded. (*Id.* at 57, 59-60). If occasional interaction was deleted from the hypothetical, the light work job of school bus monitor would qualify of which there were about 750 jobs in Iowa. (*Id.* at 61-62).

21

## II.   FINDINGS OF THE COMMISSIONER

In order to qualify for benefits under the Act, Mr. Clemons must be disabled. "[An] individual shall be considered to be disabled . . . if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). *See Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). The Commissioner uses the following five-step evaluation to determine whether a claimant is disabled within the meaning of the Act and therefore eligible for disability benefits: "whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." *Byes v. Astrue*, 687 F.3d 913, 915 n.2 (8th Cir. 2012)(quoting *King v. Astrue*, 564 F.3d 978, 979 n.2 (8th Cir. 2009)); *see Bernard v. Colvin*, 774 F.3d 482, 486 (8th Cir. 2014). This case centers on the residual functional capacity ("RFC") found by the ALJ and the ability to perform any other work within the RFC.

The ALJ made the following findings in his February 8, 2013 decision:

1.  The claimant has not engaged in substantial gainful activity since January 20, 2011, the application date and the amended alleged onset date (20 C.F.R. 416.971 et seq.).

2.  The claimant has the following severe impairments: hepatitis C; inflammatory arthritis, organic brain disorder, and history of alcohol abuse (20 C.F.R. 416.920(c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 416.920(d), 416.925 and 416.926).

4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 416.967(b) except: he cannot climb ladders, ropes, or scaffolds; he can occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; he can frequently reach, handle, finger, and feel; he must avoid hazards; and he is limited to performing simple and repetitive tasks involving little or no change in work routine.

5.  The claimant is unable to perform any past relevant work (20 C.F.R. 416.965).

6.  The claimant was born on September 8, 1958 and was 52 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed (20 C.F.R. 416.963).

7.  The claimant has at least a high school education and is able to communicate in English (20 C.F.R. 416.964).

8.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled,"

23

whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since January 20, 2011, the date the application was filed (20 C.F.R. 416.920(g)).

(Tr. at 19-26). While the ALJ concluded Mr. Clemons' impairments could cause the symptoms he alleged, the ALJ found "the intensity, persistence and limiting effects of these symptoms are not entirely credible" for reasons discussed below. (*Id.* at 24).

## III. STANDARD OF REVIEW

This Court "will affirm the ALJ's findings if supported by substantial evidence on the record as a whole." *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011)(quoting *Medhaug v. Astrue*, 578 F.3d 805, 813 (8th Cir. 2009)); *see Lawson v. Colvin*, 807 F.3d 962, 964 (8th Cir. 2015); *Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013); *Young v. Astrue*, 702 F.3d 489, 491 (8th Cir. 2013); 42 U.S.C. § 405(g)("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").

Substantial evidence is less than a preponderance, but is enough that a reasonable

24

> mind would find it adequate to support the
> Commissioner's conclusion. To determine
> whether substantial evidence supports the
> decision, we must consider evidence that both
> supports and detracts from the decision. If
> substantial evidence supports the ALJ's
> decision, we will not reverse the decision
> merely because substantial evidence would have
> also supported a contrary outcome, or because
> we would have decided differently.

*Wildman v. Astrue*, 596 F.3d 959, 963-64 (8th Cir. 2010)(internal

citations and quotation marks omitted); *see Cypress v. Colvin*, 807

F.3d 948, 950 (8th Cir. 2015); *Phillips v. Colvin*, 721 F.3d 623,

625 (8th Cir. 2013); *Kamann*, 721 F.3d at 950; *Young*, 702 F.3d at

491. The ALJ's decision will not be overturned so long as the

decision "falls within the available zone of choice." *Buckner v.

Astrue*, 646 F.3d 549, 556 (8th Cir. 2011); *Heino v. Astrue*, 578

F.3d 873, 879 (8th Cir. 2009)(quoting *Bradley v. Astrue*, 528 F.3d

1113, 1115 (8th Cir. 2008)). "The ALJ's decision 'is not outside

the zone of choice simply because [the Court] might have reached

a different conclusion had [the Court] been the initial finder of

fact.'" *Heino*, 578 F.3d at 879 (quoting *Bradley*, 528 F.3d at 1115);

*see Buckner*, 646 F.3d at 556.

## IV. DISCUSSION

Both sides appear to agree the case turns on the

credibility of Mr. Clemons' claims about the disabling effect of

his symptoms. The Commissioner concedes that "if credited, bi-

monthly flare ups would prevent [Mr. Clemons] from working." (Def. Brief [9] at 7). That is because the flare ups Mr. Clemons describes would require him to miss more work than the VE said an employer would tolerate. (Tr. at 55). For his part, Mr. Clemons argues that "[t]he only question is how often the flare ups occur." (Pl. Brief [8] at 21). It is understandable then that Mr. Clemons' primary challenge[6] to the ALJ's decision is that the ALJ's assessment of his credibility was flawed. Specifically, Mr. Clemons argues the ALJ erroneously required him to provide absolute documentation of every occasion when Mr. Clemons' rheumatoid arthritis flared up and the objective medical evidence does not support the reasons the ALJ gave for discounting Mr. Clemons' testimony.

In considering the credibility of a claimant's subjective allegations of pain an ALJ must apply the factors in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Wildman,* 596 F.3d at 968; SSR 96-7p. Those factors include:

> (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the condition; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and

---

[6] In his Complaint, Mr. Clemons alleged the ALJ improperly omitted from the RFC and hypothetical question to the VE the ALJ's finding Mr. Clemons would have moderate difficulties maintaining concentration, persistence or pace in a work setting (Complaint [1] at 2). Mr. Clemons has not briefed that issue, however.

> aggravating factors; and (5) functional
> restrictions.

*Wildman*, 596 F.3d at 968 (quoting *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001)). "Other factors include the claimant's 'relevant work history and the absence of objective medical evidence to support the complaints.'" *Id.* (quoting *Gowell*, 242 F.3d at 796). "The ALJ may disbelieve subjective complaints if there are inconsistencies in the evidence as a whole." *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004). So long "'as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so,'" courts are to defer to the ALJ's credibility finding. *Wildman*, 596 F.3d at 968 (quoting *Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007)(internal quotation omitted)); *McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011).

The ALJ conducted a thorough chronological review of Mr. Clemons' medical records, finding the claims of "extremely limited functional capacity" were not demonstrated in the medical record. (Tr. at 24). He appears to have discounted Mr. Clemons' credibility because (1) Mr. Clemons was not diligent in seeking specialized treatment for his arthritis; (2) the medical record, and Mr. Clemons' own statements, indicated the ongoing coordinated treatment plan at UIHC for hepatitis C and rheumatoid arthritis would help control the alleged disabling symptoms; and (3) there

was "sparse" evidence in the medical record of the "alleged chronic flare ups." (*Id.*) The Court will examine these findings in turn.

As the ALJ saw it, Mr. Clemons was slow to pursue specialized treatment for his arthritis, satisfied to seek pain medication from emergency departments when his medication ran out.

> His claims of extremely limited functional capacity are not demonstrated by the medical records. He was referred to rheumatology at the University of Iowa in January of 2011, but missed his appointment several times before finally being seen in February of 2012. He continued to miss this appointment for several months, even after being advised that his primary care clinic would no longer prescribe pain medication because he needed to see a specialist for his inflammatory arthritis, and after hematology advised him that he could not start treatment for hepatitis C until he was seen by rheumatology. Instead, the claimant chose to avail himself of emergency department services to obtain pain medication when he ran out.

(Tr. at 24).

Mr. Clemons was referred to the University of Iowa rheumatology department by CHI in January 2011, but did not get there until February 2012. In fact, he had been told as early as November 2010, that he needed to apply for an Iowa Care card so a referral could be made. Mr. Clemons missed his May 17, 2011 appointment at UIHC.  The physician's assistant who saw him at CHI shortly afterward believed he had missed a couple of appointments and told him he needed to take responsibility to get to UIHC for the treatment he needed. (Tr. at 1266). Mr. Clemons was seen in

28

the UHIC Hepatology Department on June 29, 2011 and physician's assistant Dee requested a rheumatology consult. (*Id.* at 1258). When she saw him again on September 9, 2011 Ms. Dee noted a rheumatology consult was pending and scheduled for October. (*Id.* at 1252). Mr. Clemons had acquired his Iowa Care car months earlier. Why the rheumatology consult was further delayed to February 3, 2012 is not clear.

The medical records support the findings of the ALJ to the extent that Mr. Clemons was slow to pursue specialized treatment for his arthritis at UIHC, at least until CHI told him on May 24, 2011 he would not be prescribed narcotic pain medication and needed to take responsibility for his treatment. Before then, he had gone to CHI about two or three times a month complaining of pain in his hands and/or feet and seeking pain medication. Clearly CHI was frustrated with his lack of follow-up. Except on one occasion, it appears Mr. Clemons did not thereafter return to CHI, instead going to hospital emergency rooms with his complaints of pain, though much less frequently when he came under the care of UIHC. "A failure to follow a recommended course of treatment . . . weighs against a claimant's credibility." *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005)(citation omitted); *see Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995)("Failure to follow a prescribed course of remedial treatment without good reason is

grounds for denying an application for benefits."). Mr. Clemons ultimately pursued the recommended course of treatment for his arthritis, and the hepatitis C which contributed to it, but his failure to seek treatment for the pain causing condition until pressed to do so could be taken by the ALJ as an adverse factor in assessing Mr. Clemons' credibility about the frequency and severity of his symptoms.

The ALJ found that Mr. Clemons' condition would likely improve after Mr. Clemons completed his treatment for hepatitis C and began taking again the medications which had helped control his arthritis.

> The claimant indicated that he is able to function independently and without difficulty except during periodic flare ups of his inflammatory arthritis. These flare ups allegedly occur about twice a month for a couple days at a time, and affect his legs and hands. The claimant stated that although medication does not relieve his pain completely, the pain is not debilitating when he takes the medication. The claimant recently started treatment for hepatitis C that is projected to last 24 weeks and during which he cannot take medication for rheumatoid arthritis. However, once he completes treatment, he will be able to resume his medical regimen that has helped to control his symptoms.

(Tr. at 24).

The ALJ's description of Mr. Clemons' testimony is generally accurate, though to be clear, Mr. Clemons did not say the medication eliminated the debilitating effects of his flare ups. He did in substance testify he could function independently

without difficulty except when his arthritis flared up. (Tr. at 45-46), He also testified that the flare ups occurred about twice a month, lasted for a couple of days, and affected his legs and hands. (*Id.* at 41-42). He described the flare ups as "pretty debilitating" and "very painful," that he could not walk and his fingers would swell up like a "package of hot dogs." (*Id.* at 41). Mr. Clemons had been taking Prednisone for his arthritis but had been taken off that medication while undergoing the interferon/ribavirin treatment for hepatitis C. (*Id.* at 42). He testified that while he was taking Prednisone "the flare ups didn't seem quite as bad," he still had flare ups "[j]ust not as debilitating." (*Id.* at 42). He also testified that the pre—hepatitis treatment medication regimen "helped a little bit," but he still had flare ups though not as severe. (*Id.* at 43, 47-48).

Beyond his hearing testimony, the medical records document a number of occasions on which Mr. Clemons told health care providers that the flare ups, pain and swelling were less frequent or severe when he was on medication. On February 4, 2011 Mr. Clemons told a CHI doctor that "as long as he takes the medication the pain is better." (Tr. at 1236). When seen at the UIHC emergency room on February 10, 2011 Mr. Clemons reportedly told the doctor that he had been "having 1-2 flares per month, which usually come if he stops taking his medications." (*Id.* at

31

1208). When he returned to CHI on March 16, 2011 the clinic notes indicate Mr. Clemons said that while he was not sure, "it seemed like he had fewer flares, not as bad" when on Prednisone though it made him jittery. (*Id.* at 1234). When he saw UIHC's Ms. Dee on January 24, 2012 Mr. Clemons reported he had better control of joint pain and swelling when taking Prednisone, though continued to have flare ups a couple of times a month. (*Id.* at 1288).

The hepatitis C treatment may help with the arthritis, and as Mr. Clemons' statements suggest, return to the arthritis medication, chiefly Prednisone, should as it did before, mitigate the severity and frequency of the flare ups (which presumably is what the medication is intended to do). The ALJ's finding that return to arthritis medication after the hepatitis C treatment would "help[ ] . . . control his symptoms" finds support in the evidence. "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." *Stout v. Shalala*, 988 F.2d 853, 855 (8th Cir. 1993). While it is too much to say that Mr. Clemons' impairment can be completely controlled by treatment, its disabling effects should be reduced by treatment.

On the sparsity of the medical record to support Mr. Clemons' assertion the flare ups precluded him from working, the ALJ reasoned:

> The medical record does not support the claimant's
> assertion that he is precluded from functioning four
> days a month; rather, the record is relatively sparse
> concerning evidence of his alleged chronic flare ups.
> This is presumably because when the claimant abstains
> from alcohol and is able to maintain his medical regimen
> when not undergoing hepatitis C treatment, his symptoms
> are largely controlled. Thus, from a longitudinal
> perspective, the record supports the finding that the
> claimant is capable of a reduced range of light work.

(Tr. at 24).

The Court does not view the ALJ as having insisted that Mr. Clemons provide a perfect written record documenting all of his flare ups as Mr. Clemons argues. The ALJ was entitled to draw reasonable inferences from the medical records presented. Those records show that Mr. Clemons went to CHI or hospital emergency rooms complaining of pain in his hands and/or feet, often seeking pain medication, typically a couple of times a month until his second UIHC hepatitis consult in September 2011 when a treatment plan in conjunction with a pending rheumatology consult was discussed. In the subsequent approximately seventeen months Mr. Clemons went to emergency rooms seeking medication for his symptoms on three documented occasions, and attended scheduled UIHC hepatitis and rheumatology appointments on four others. This history together with the evidence that Mr. Clemons' medical regimen, when not interrupted for hepatitis C treatment,[7] had

---

[7] The hepatitis C treatment would have begun in mid-November 2012.

helped control his symptoms, supports an inference the flare ups needing medical attention had become less frequent or severe and medication had proved effective in helping control the flare ups. To this extent the ALJ's observations about the medical record find support in the evidence, though, that Mr. Clemons' symptoms would be "largely controlled" by continued treatment remained to be seen.

The medical record is sparse with respect to direct medical evidence of functionality. Dr. Weis's functional assessment weighs little because he did not treat or examine Mr. Clemons.[8] *See Papesh v. Colvin*, 786 F.3d 1126, 1133 (8th Cir. 2015). Dr. Rabinowitz did not opine on the subject. Nor did any treating physician or other medical source do so. It is fair to note that Mr. Clemons' complaints of pain and swelling were generally consistent over time, appear to have been taken at face value by medical providers, and swelling (as well as other objective symptoms) was noted on a number of occasions, though sometimes not.

RFC "is a medical question and 'at least some' medical evidence must support the ALJ's RFC determination . . . ." *Wildman*,

---

[8] The ALJ did not specifically refer to Dr. Weis's assessment though the ALJ appears to have incorporated many of Dr. Weis's postural and manipulative limitations in the RFC. (*Compare* Tr. at 21 (ALJ) *with* Tr. at 1222-1223 (Dr. Weis)).

596 F.3d at 969 (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). The Court has considered whether the case should be remanded for a consultative examination to specifically address Mr. Clemons' capacity to work, but has concluded remand for this purpose is not necessary because, as the Commissioner accurately puts it, "[t]he only real dispute is whether substantial evidence supports the ALJ's decision to discount Plaintiff's credibility." (Def. Brief [9] at 7). As discussed previously, there is "at least some" medical evidence which supports the ALJ's findings. If Mr. Clemons' statements are accepted -- that the twice monthly arthritis flare ups he describes prevent him from working up to four days a month -- he is disabled. If, on the other hand, Mr. Clemons' description of the seriousness, limiting effects, and persistence of the flare ups is discounted, he should be able to do light work with the limitations found in the ALJ's RFC.

The ALJ's assessment of Mr. Clemons' credibility reflects consideration of the circuit's *Polaski* factors to the extent relevant. The reasons given by the ALJ for discounting Mr. Clemons' claims, while not entirely accurate, nonetheless find adequate support in the record.

Finally, Mr. Clemons presents a "grid rule" issue. He argues "if he is unable to consistently stand for the time necessary to do full-time light work, [he] should be found disabled

per the grid rules" citing 20 C.F.R. Part 404, Subpt. P, Appendix 2 (hereinafter "Part 404") § 201.14. (Pl. Brief [8] at 24). In relevant part, the regulations defining "light work" state:

> . . . [A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 416.967(b). In his assessment Dr. Weis wrote that Mr. Clemons could stand or walk about six hours in an eight hour day, and sit for an equal period. (Tr. at 1221). Mr. Clemons told Dr. Rabinowitz that he could "stand, sit and walk for limited periods of time." (*Id.* at 1214). At hearing Mr. Clemons testified that when taking Prednisone he could "probably stand still on 20 minutes or so . . . probably totally . . . a couple of hours a day on my feet" when not having a flare up. (*Id.* at 47). He said he could not stand during a flare up even when taking Prednisone. (*Id.*) The job he had had assembling light sockets required him to stand eight hours a day. He left after three or four weeks because he could not stand that long. (*Id.* at 48-49). In response to the second hypothetical adding a 50/50 stand-sit limitation, the VE testified a large number of jobs would be available in Iowa including parking lot cashier and some types of assembly work (*id.* at 54), and later, school bus monitor. (*Id.* at 66).

36

In finding Mr. Clemons could perform full-time light work the ALJ implicitly concluded Mr. Clemons could perform work within the scope of the light work definition, including specifically, a "good deal" of standing. This description is elastic enough to embrace Mr. Clemons' testimony that he could stand a total of a couple hours a day when not having a flare up. The extent to which the frequency and severity of the flare ups prevented him from light work is bound up in the credibility issue discussed previously.

At the time of the hearing Mr. Clemons was "approaching advanced age (age 50-54)." Part 404, § 200.00(g). He would be disabled under grid rule § 201.14 only if his work capacity was limited to sedentary work. (*Id.* Table 1). The ALJ's finding that Mr. Clemons could perform light work (as opposed to sedentary) precludes applicability of the grid rule.

In conclusion, while there is substantial evidence that Mr. Clemons is disabled by the severe impairments from which he suffers, if his credibility is discounted substantial evidence also supports the contrary findings made by the ALJ. The ALJ's decision falls within the available zone of choice. The Court thus concludes the Commissioner's finding that Mr. Clemons had the residual functional capacity to perform light work with the

limitations noted is supported by substantial evidence in the record when viewed as a whole.[9]

## V.   REPORT AND RECOMMENDATION AND ORDER

IT IS RESPECTFULLY RECOMMENDED that the Commissioner's decision denying Mr. Clemons' application for supplemental security income benefits be affirmed.

IT IS ORDERED that the parties have until **February 16, 2016** to file written objections to the Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1). *Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Wade for Robinson v. Callahan*, 976 F. Supp. 1269, 1276 (E.D. Mo. 1997). Any objections filed must identify the specific portions of the Report and Recommendation and relevant portions of the record to which the objections are made and must set forth the basis for such objections. *See* Fed. R. Civ. P. 72; *Thompson*, 897 F.2d at 357. Failure to timely file objections may constitute a waiver of plaintiff's right to appeal questions of fact. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994); *Halpin v. Shalala*, 999

---

[9] For relief, Mr. Clemons seeks remand for the ALJ to reassess his credibility and an RFC which adequately reflects his complaints of pain and limitations. (Pl. Brief [8] at 26). The Commissioner agrees that if the ALJ did not adequately assess Mr. Clemons' credibility remand is the appropriate remedy. (Def. Brief [9] at 7).

F.2d 342, 345 & n.1, 346 (8th Cir. 1993); *Thompson*, 897 F.2d at 357.

**IT IS SO ORDERED.**

Dated this 28th day of January, 2016.

ROSS A. WALTERS
UNITED STATES MAGISTRATE JUDGE